[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this case, plaintiff Lewis A. Lizotte, the owner of an 82-acre parcel of land ("subject property" or "82-acre parcel") in the Town of Enfield, Connecticut, has sued the Town of Enfield Planning and Zoning Commission ("Enfield PZC") and several of its former members to obtain the following relief in connection with the defendants' alleged breach of a September 1988 agreement to settle two 1987 lawsuits against them: (1) a decree compelling the defendants to perform the alleged settlement agreement by reissuing a certificate acknowledging the automatic statutory approval, under General Statutes § 8-26, of his July 31, 1987 application for a special permit to build a planned unit development known as Oldefield Farms II on the subject property; and (2) compensatory damages for all losses he claims to have suffered as a result of the defendants' continuing failure to comply with the terms of the alleged settlement agreement.
CT Page 11949 In his third revised complaint dated January 5, 1994, the plaintiff first alleges that the settlement agreement in question was finalized in September of 1988, and that he fully performed all duties imposed upon him thereunder on or before October 4, 1988. The plaintiff next alleges that, although the defendants initially took steps to perform the agreement by authorizing the issuance of a certificate of statutory approval for the construction of Oldefield Farms II at an executive session of the Enfield PZC on October 6, 1988, they later breached that agreement by refusing to reissue said certificate after the State Freedom of information Commission ("FOIC") ruled, in July of 1989, that the October 6, 1988 executive session was illegally noticed and conducted, and thus that all actions taken during that session were null and void. Though all of the plaintiffs claims are squarely based on the foregoing allegations, each purports to state a different legal theory of recovery. They sound, respectively, in misrepresentation (First Count), breach of contract (Second and Fifth Counts), violation of administrative res judicata (Third Count), violation of federal civil rights (Fourth Count), and estoppel (Sixth Count).
The defendants have denied or left the plaintiff to his proof as to each essential allegation of his third revised complaint. They have also pleaded the following special defense: "Each count in the plaintiffs complaint predicates relief upon a meeting and agreement which have been deemed void and illegal and therefore unenforceable and against public policy."
The case was tried on divers dates in 1995 and 1996, with post-trial briefs submitted in May of 1996. Based on the testimony and other evidence presented at trial, the Court makes the following findings of fact and conclusions of law:
 FINDINGS OF FACT
1. Plaintiff Lewis A. Lizotte is a builder and real estate developer who at all times relevant to this case has lived and worked in North Central Connecticut.
2. In December 1982, the plaintiff and two partners, Matthew C. Alaimo and Nicholas J. Dellaquilla, acquired a 117-acre parcel of undeveloped land in Enfield, Connecticut. The parcel, which was then zoned R-33 residential, was located to the east of Palomba Drive in Enfield, extending from Freshwater Brook and Elm Street on the north to Hazard Avenue on the south.
CT Page 11950 3. Though the purchase price of the 117-acre parcel was only $46,000, it was encumbered by over $100,000 in liens which the plaintiff and his partners were ultimately required to settle by making negotiated payments totaling $94,148.33.
4. Upon acquiring the 117-acre parcel, the plaintiff and his partners intended to develop it as a planned residential community called Oldefield Farms. Phase I of Oldefield Farms ("Oldefield Farms I"), which was to be built on the southern 35 acres of the property (the "35-acre parcel"), fronting on Hazard Avenue, was to consist of 105 condominium units arranged in clusters. Phase II of the new development ("Oldefield Farms II"), which was to be built on the northern 82 acres of the property (the "82-acre parcel") after the completion of Oldefield Farms I, was to consist of 368 additional condominium units, also arranged in clusters.
5. In February of 1983, the plaintiff and Matthew C. Alaimo, doing business as LAD Development Corporation ("LAD"), applied to the Enfield PZC for a special permit to develop Oldefield Farms I. As part of their application, they proposed that all sewerage from Oldefield Farms I be pumped uphill to the south, to an existing Town sewer line running along Hazard Avenue, by means of a new pumping station to be built on the 35-acre parcel. Had this proposal been adopted, however, the Hazard Avenue sewer line would have been overburdened and the Town would have been required, at public expense, to take over the maintenance and operation of the new pumping station to ensure against leakage, and thus to prevent the occurrence of serious health problems. In light of these concerns, the Town's public works director, Roger Mullins, recommended that the proposed new pumping station not be built, and instead that all sewerage from Oldefield Farms I be directed downhill to the north, to a large trunk sewer running along Freshwater Brook, by means of a new gravity sewer line to be built across the applicants northern 82-acre parcel. With this modification, the PZC approved LAD's application for a special permit to develop Oldefield Farms I.
6. Over the next four years, LAD built, marketed and sold all 105 new condominium units in Oldefield Farms I. Early in that process, by the end of 1984, the plaintiff and his partner, Mr. Alaimo, complied with the terms of their special permit by building a new gravity sewer line from the site of the new condominiums to the large trunk sewer running along Freshwater Brook.
CT Page 11951 7. In building the new sewer line across their 82-acre parcel, the plaintiff and his partner spent a great deal of money improving that parcel, including over $450,000 for new sewer pipe and approximately $140,000 for excavation, landscaping and wetlands work on the property. Surely, one effect of making such costly improvements was to enhance the potential of that parcel for future development as Oldefield Farms II. As previously stated, however, the PZC's sole purpose for requiring the building of the new sewer line through the 82-acre parcel was to ensure the safe and proper sewering of Oldefield Farms I. The Court therefore rejects the plaintiffs suggestion that by imposing that requirement, the PZC impliedly signaled its advance approval for the later development of Oldefield Farms II.
8. On February 4, 1987, the plaintiff became the sole owner of the 82-acre parcel. On that date, having previously paid $235,000 to Nicholas J. Dellaquilla's for his undivided one third interest in the parcel, he completed his acquisition by purchasing Matthew C. Alaimo's undivided one-third interest for $319,000.
9. Though the plaintiff intended, upon buying out his partners, to proceed at once with the development of Oldefield Farms II, he was aware from the outset that the PZC had recently imposed a nine-month moratorium on all new construction of planned residential developments in the Town of Enfield. The moratorium, which originally became effective on September 5, 1986, provided in pertinent part as follows:
 During this moratorium period, no application for Planned Residential Developments shall be received by the Planning and Zoning Commission.
Plaintiffs Exhibit #3, p. 4. On April 30, 1987, the moratorium was extended for an additional six months, to December 5, 1987.
10. Upon consulting with his long-time attorney, Attorney James W. Sherman of Gilman Marks, the plaintiff was advised that both the original moratorium and the moratorium extension had been illegally adopted, and thus that notwithstanding their adoption, the PZC would be legally required both to "receive" any special permit application he might file during the moratorium period and to take action on that application in the time and manner prescribed by law. Its failure or refusal to do so, he was further advised, would result in the automatic statutory approval CT Page 11952 of his application by operation of law. So advised, the plaintiff promptly hired an architect to draft a site plan for Oldefield Farms II, prepared an application for a special permit to proceed with its development, and on July 31, 1987, while the extended moratorium was still in effect, employed a sheriff to make personal service of both documents on all regular and alternate members of the PZC.
11. On September 3, 1987, at its next regularly scheduled meeting following the plaintiffs service upon them of his special permit application and site plan for the development of Oldefield Farms II, the PZC formally refused to "receive" those documents, and thus resolved not to consider them until the moratorium had expired. Thus on December 1, 1987, no action having yet been taken on his special permit application and site plan, the plaintiff, through Attorney Sherman, demanded that the PZC issue a certificate formally acknowledging their automatic approval by operation of law as of November 8, 1987. As grounds for this demand, the plaintiff argued: (a) that the moratorium and moratorium extension had been illegally adopted; (b) that the PZC therefore had no lawful basis for refusing to receive his special permit application and site plan when those documents were served upon them; (c) that the PZC had received his application and site plan as a matter of law either on September 3, 1987, the date of its next regularly scheduled meeting after the documents were submitted, or on September 4, 1987, the thirty-fifth day after their submission; (d) that under General Statutes §§ 8-3 (g),8-3c, 8-7d, 8-26d and 8-26e, a special permit application is automatically approved by operation of law if the agency to which it is submitted fails to publish notice of it and commence a hearing on it within sixty-five days of its receipt; and (e) that here, since the PZC had failed or refused to publish notice of or commence a hearing on the plaintiffs special permit application and accompanying site plan for the development of Oldefield Farms II within that sixty-five-day period, which expired on November 8, 1987 at the latest, those documents were automatically approved by operation of law on that date. At its next regularly scheduled meeting on December 3, 1987; which was attended by Attorney Sherman, the PZC refused the plaintiffs demand for the issuance of a certificate of automatic statutory approval.
12. Meanwhile, on October 14, 1987, while the moratorium extension was still in effect, the PZC adopted a change in the Master Plan of Development for the Town of Enfield which calledinter alia, for the "upgrade" of all R-33 residential properties to R-44. The principal effect of this upgrade was to decrease the CT Page 11953 number of bedrooms per acre in an R-33 zone from 5.33 to 4. On November 25, 1987, the PZC implemented this change in the Master Plan by passing a zone change upgrading all R-33 properties to R-44.
13. As the owner of the 82-acre parcel and of an absolute option to purchase another 52-acre parcel which was also in an R-33 residential zone, the plaintiffs interests, as the potential developer of both properties, were adversely affected by the change in zone. The new and greater density restrictions imposed by the zone change decreased the potential profitability of any future development on either property by reducing the size and number of new units that could be built there. Therefore, on or about December 9, 1987, the plaintiff commenced an appeal from the zone change entitled Lewis A. Lizotte v. Enfield Planning andZoning Commission, et al., which proceeded in this Court under Docket Number CV 88-0339468 S. In this action (the "zoning appeal"), the plaintiff raised several statutory and constitutional challenges to the zone change. In addition, he challenged the legality of the above-described moratorium and moratorium extension, which had recently expired, claiming that their enforcement before the zone change had unlawfully prevented him from developing his property more profitably than could later be done after the zone change went into effect.
14. Within one week of commencing his zoning appeal, the plaintiff commenced a second action against the PZC and each of its regular and alternate members, seeking a writ of mandamus to compel them to issue the certificate of automatic statutory approval of his special permit application and site plan which they had previously refused to issue. This second action (the "mandamus action"), which was also entitled Lewis A. Lizotte v.Enfield Planning and Zoning Commission, et al., proceeded in this Court under Docket Number CV 88-0339775 S.
15. Though on November 7, 1987, the plaintiff obtained a permit from the Town of Enfield Conservation Commission to perform wetlands work on his 82-acre parcel, he did no such work on the parcel under that permit in 1987 or 1988.[1] Instead, his focus during that period was on the prosecution, with the assistance of Attorney Sherman, of his zoning appeal and mandamus action.
16. In the early spring of 1988, the defense of the plaintiffs two actions against the defendant PZC and its individual members was put in the hands of Attorney Jeffrey J. CT Page 11954 Mirman, of Tarlau, Levy, Harding Droney, P.C. From the very start of his representation of the defendants, Attorney Mirman carried on discussions with plaintiffs counsel, Attorney Sherman, about the merits of the two cases and the possibility of resolving them short of trial.
17. In late June of 1988, a joint pretrial conference on both cases was conducted in the Hartford Superior Court before Judge M. Morgan Kline. During that conference, Judge Kline voiced doubts about the Town's chances of prevailing in the mandamus action. In the wake of this conference, Attorney Sherman placed frequent calls to Attorney Mirman, urging the defendants to settle both cases by agreeing to the issuance of a certificate of automatic statutory approval of the plaintiff's special permit application and accompanying site plan for Oldefield Farms II. Attorney Mirman responded to these calls by discussing Attorney Sherman's analysis with him and exchanging views as to how the cases might one day be settled. However, despite Attorney Sherman's insistence to the contrary, he never agreed, on any basis, to settle either case, and never informed Attorney Sherman, an experienced land use lawyer who knew better, that he had the power to do so. Indeed, it was not until September 15, 1988 that Attorney Mirman, after reporting his analysis of the cases to the PZC, first sought and obtained their permission to negotiate an amicable settlement of them. Even then, however, the PZC only authorized Attorney Mirman to conduct settlement negotiations, not to consummate a final agreement without their approval.
18. Acting within the scope of his authority to negotiate the terms of an amicable settlement that the PZC might approve, Attorney Mirman promptly contacted Attorney Sherman to inform him of the PZC's interest in settling and to discuss possible settlement terms. Initially, counsel discussed the possibility of resolving the two cases by a stipulation to judgment for the plaintiff in the mandamus action on the following conditions: (a) that the PZC would execute and deliver a certificate attesting to the automatic approval of the plaintiffs special permit application and site plan by operation of law on November 8, 1987; (b) that the issuance of that certificate would not waive other municipal approvals required for the development of Oldefield Farms II; (c) that the plaintiff would provide a general release relative to the mandamus action; and (d) that the plaintiff would amend his zoning appeal to delete all references to the moratorium, the moratorium extension, and the 82-acre parcel. Anxious to promote such a settlement, which would enable CT Page 11955 his client to proceed with the development of Oldefield Farms II, Attorney Sherman promptly drafted a three-page document entitled "Stipulation," which he claims to have mailed, unsigned, to Attorney Mirman, together with a signed general release of the mandanius action and an unsigned amended complaint reflecting the proposed changes in the zoning appeal.
19. In his testimony at trial, Attorney Sherman characterized his written communication of September 16, 1988 as an important step in "performing" a prior oral agreement he had reached with Attorney Mirman to settle both cases sometime in early September of 1988. In support of that claim, he pointed in particular to his client's alleged signature of a general release of the mandamus action and his own preparation of an amended pleading in the zoning appeal, neither of which, he claimed, would have been done had a final settlement agreement not yet been reached. However, for the reasons that follow, the Court rejects this claim.
20. First, Attorney Sherman's own written "Stipulation" is inconsistent with his claim at trial. To begin with, the writing is unsigned and undated. Had it been more than a mere draft proposal, and instead been the embodiment of a final agreement, it would logically have been signed and dated before it was sent out. In that event, moreover, explicit reference to the prior agreement would probably have been made, by date or otherwise, in one of the Stipulation's introductory clauses. Here, however, there is no such reference.
21. Second, had Attorney Sherman's Stipulation been more than a draft proposal, it would have omitted no material terms. Here, however, the Stipulation contains the following language in paragraph 6:
 6. That the Zoning Ordinances Section 10-7 Bonding shall be in an amount equal to 100% of all costs calculated and phased as follows: (to be supplied)
Plaintiff's Exhibit #7, p. 3, ¶ 6. If suitable arrangements for bonding were sufficiently important to be included in the parties' final agreement, the details of those arrangements would have been included in the agreement as well. An agreement to agree to a material term at a later time is no agreement at all.
22. Third, though Attorney Shennan has entitled his writing a Stipulation, it is accompanied by a fax cover sheet, written in CT Page 11956 Attorney Sherman's own hand, on which adjacent to three crossed-out words — "AMENDED COMPLAINT," "GEN'L RELEASE," and "STIPULATION" — the following words appear: "ADDITION TO ¶ 6 OF DRAFT STIPULATION." Plaintiffs Exhibit #7, p. 1. Though their appearance on the fax cover sheet was never satisfactorily explained at trial, their obvious meaning is that the attached writing was merely the draft of a proposed stipulation, not the embodiment of a final agreement that had previously been negotiated. Not surprisingly, then, six days later, on September 22, 1988, Attorney Shennan made an identical reference to a "draft stipulation" on a second fax cover sheet which he transmitted to Attorney Mirman. See Plaintiff's Exhibit ft 8. By using these words, Mr. Sherman expressly signaled his own contemporaneous understanding that negotiations to settle his client's lawsuits were not yet over.
23. Further proof that Attorney Sherman's September 16, 1988 communication to Attorney Mirman was merely a proposal for resolving the parties' dispute rather than the performance of a prior oral agreement to do so can be found in Attorney Mirman' s responding fax of September 29, 1988 and Attorney Sherman's reaction thereto. The fax consisted of a single fax cover sheet, together with a one-page cover letter and an attached, unsigned and undated three-page document entitled "Settlement Agreement."
24. In his one-page cover letter to Attorney Sherman, Attorney Mirman wrote as follows:
Dear Jim,
 Attached is a draft Settlement Agreement in connection with resolution of Mr. Lizotte's claims against the Planning and Zoning Commission. I offer this draft for discussion purposes only. After you have had an opportunity to review the draft, please contact me so that we might discuss settlement further.
I apologize for the delay in getting this to you.
Sincerely,
Jeffrey J. Mirman
Plaintiffs Exhibit #9, p. 3. By this choice of words, Attorney Mirman gave clear notice that, at least in his own mind, the plaintiffs claims against the PZC had not yet been resolved, and CT Page 11957 that any settlement of them would require further discussions. Equally clearly, the draft Agreement he attached to his letter was neither the embodiment of some previously negotiated agreement between the plaintiff and his clients nor a firm and final offer which the plaintiff could accept if he agreed to its terms. Instead, as Attorney Mirman described it, it was a "draft for discussion purposes only," which he was permitted to discuss, but not authorized to agree to.
25. Had Attorney Sherman believed that in early September, he and Attorney Mirman had reached a firm and final agreement to settle his client's lawsuits, he would surely have responded to Attorney Mirman's September 29, 1988 fax with chagrin and amazement, contacting him immediately to confirm the existence of the prior agreement and to remind Attorney Mirman of its essential terms. Here, however, Attorney Sherman admittedly did not even raise the topic with Attorney Mirman, much less attempt to convince him that a different agreement had already been reached.
26. Attorney Sherman's silence in the face of Attorney Mirman's September 29, 1988 communication is especially striking when one considers the substantial differences between the terms proposed in that document and those set forth in Attorney Sherman's September 16, 1988 Stipulation. First, whereas the Stipulation, as its title suggested, proposed that the mandamus action be resolved by a stipulation to judgment, Attorney Mirman's draft Settlement Agreement provided that that action would be withdrawn. Such a difference is major indeed.
27. Second, whereas Attorney Sherman's Stipulation provided only for a general release of the mandamus action, Attorney Mirman's draft Settlement Agreement listed all defendants whom the plaintiff had sued, and expressly called for the release of each such defendant on all claims the plaintiff would no longer pursue, on the zoning appeal as well as the mandamus
28. Third, Attorney Mirman's draft Settlement Agreement contained several terms that did not appear anywhere in Attorney Sherman's Stipulation. They included: (a) a provision stating that by entering into a settlement agreement, none of the defendants would be admitting any wrongdoing in his dealings with the plaintiff and (b) a confidentiality provision made binding upon the plaintiff and his lawyer.
29. Fourth and finally, the draft Settlement Agreement CT Page 11958 proposed bonding requirements for the project that differed materially from, and were far more onerous than, those set forth in the Attorney Sherman's Stipulation. Though the Stipulation was incomplete with respect to bonding, for the reasons previously stated in paragraph 21 above, it did specify that the project would be built in phases, with each phase to be separately bonded. As the plaintiff and Attorney Sherman admitted in their testimony, they had hoped to bond the project in this manner, for if that could be done, the high cost of bonding could be significantly reduced. In Attorney Mirman's draft Settlement Agreement, by contrast, all references to phased development were eliminated, and it was expressly stated that bonding for the project would be set "in an amount equal to 100% of all costs calculated." Plaintiff's Exhibit ft 9, ¶ 8, p. 6. To reiterate, Attorney Sherman's silence in the face of this substantial departure from terms he claims to have negotiated with Attorney Mirman in early September strongly suggests that there was never such an agreement in the first place, and that Attorney Sherman knew it.
30. Against this background, the Court must reject the plaintiff's claims that by early September of 1988, Attorney Mirman and Attorney Sherman had agreed to settle the plaintiffs pending zoning appeal and mandamus action. Attorney Mirman had no authority to enter into such an agreement without the approval of the PZC, he never claimed or did anything to suggest that he had such authority, and to the contrary, he never proposed possible terms of settlement without clearly stating that they were for discussion purposes only. The experienced Attorney Sherman, moreover, was well aware of the limits of Attorney Mirman's authority, and made it clear by his conduct throughout September of 1988 that a settlement agreement, though possibly close at hand, had not yet been reached.
31. In fact, in the week following September 29, 1988, Attorneys Mirman and Sherman continued their negotiations in an effort to find a mutually agreeable set of terms that each could propose, as the basis for a final settlement agreement, to his client. Time was of the essence, as the next regularly scheduled meeting of the PZC was then set for October 6, 1988.
32. Consistent with the plaintiffs strong desire to obtain a certificate of statutory approval for his special permit application and associated maps and site plans, Attorney Sherman responded to Attorney Mirman's draft Settlement Agreement of September 29, 1988 by agreeing at once to almost all of its CT Page 11959 terms. Minor concerns about other proposed terms were raised but quickly resolved in favor of the terms proposed in Attorney Mirman's draft Settlement Agreement. Well aware of the PZC's next meeting date, and hopeful that it would approve and implement the proposed agreement he had discussed with Attorney Mirman, Attorney Sherman drafted several documents called for by the proposed agreement so that Attorney Mirman could use them, if necessary, at the PZC's October 6 meeting. The tendered documents included: a general release of all defendants, signed by the plaintiff, which was dated September 29, 1988; a withdrawal of the plaintiffs mandamus action, signed by Attorney Sherman, which was dated October 4, 1988; and an unsigned amended complaint in the zoning appeal which comported with the terms of Attorney Mirman's draft Settlement Agreement.
33. When the PZC held its meeting on October 6, 1988, it conducted a closed-door discussion of the plaintiffs zoning appeal and mandamus action and approved by consensus Attorney Mirman's proposal that the cases be settled on essentially the same terms he had discussed with Attorney Sherman. In fact, the PZC modified Attorney Mirman's proposal in only one respect, insisting that the agreement expressly provide that no improvements could be made to the 82-acre parcel until appropriate bonding for the project had been posted. The final terms approved by the PZC were later reduced to writing as follows in a document entitled "Settlement Agreement," which Attorneys Mirman and Sherman signed on behalf of their clients on or shortly after October 6, 1988:
 WHEREAS, there are currently pending in the Superior Court of the Judicial District of Hartford two matters, one entitled Lewis A. Lizotte v. Enfield Planning and Zoning Commission, et al., bearing Docket No. CV88-0339468S, and the other being entitled Lewis A. Lizotte v. Enfield Planning and Zoning Commission, et al., bearing Docket No. CV88-0339775S; and
 WHEREAS, on or about July 31, 1987, Mr. Lizotte filed in the office of the Enfield Town Planner a Special Use Permit application for a planned residential development on 82 acres situated north of Hazard Avenue in the Town of Enfield, Connecticut, accompanied by a site plan; and
WHEREAS, on or about September 3, 1987, the Enfield Planning and Zoning Commission voted not to receive Mr. Lizotte's application; and CT Page 11960
 WHEREAS, a dispute has arisen among the parties, as set forth in the allegations of the two complaints filed by Mr. Lizotte; and
 WHEREAS, the parties feel that it is in the best interests of all concerned to resolve these issues without further litigation and without incurring further delay and expense;
It is hereby stipulated and agreed as follows:
 1. The execution of this agreement shall not constitute an admission by the Enfield Planning and Zoning Commission or any of its commissioners of a violation of any state constitution, statute or regulation or common law right.
 2. The Enfield Planning and Zoning Commission, by its chairman and its secretary, shall stamp the site plan submitted as approved by operation of law pursuant to Connecticut General Statutes, as of November 8, 1987.
 3. The special permit application and site plan shall be filed as approved in the Office of the Town Clerk and indexed and recorded on the Land Records in accordance with Connecticut General Statutes § 8-3d and 8-46e.
 4. The provisions of the Enfield Zoning Ordinances, § 10-2 regarding dwelling unit equivalent is satisfied as an integral part of this approval. The parties understand by approving Mr. Lizotte's application for 460 equivalencies there are presently no equivalencies remaining in the Hazard Avenue neighborhood at the present time. The Planning and Zoning Commission may, at its discretion, effectuate whatever process it deems appropriate to effectuate a change in the number of equivalencies.
 5. Mr. Lizotte shall provide a General Release to all of the parties of this agreement relative to the Mandamus Action, Case No. CV-880339775S, and relative to Counts One and Two of Case No. CV-880339468S.
6. Mr. Lizotte will withdraw Case No. CV-880339775S (The Mandamus Action), and will amend Civil Action No. CV-880339468S to delete any reference to Zoning Ordinances §§ 9-4 and 9-4 (a), Moratorium and the Extension of the Moratorium, and to delete in their entirety counts one and CT Page 11961 two of that complaint, and to delete any reference to the subject premises of 82 acres.
 7. This statutory approval does not waive other municipal approvals required on November 8, 1987.
 8. The requirements of Zoning Ordinance § 10-7 with respect to Bonding shall be in an amount equal to 100% of all costs calculated. No improvements to the land may be made until such time an (sic) appropriate bonding has been posted.
 9. There shall be no court costs or fees payable to any of the parties.
 10. Mr. Lizotte and his Attorney agree not to make public or disclose in any manner the terms of this agreement or the discussions leading to its execution.
 11. This Agreement, and all of its provisions, shall be binding upon any and all successors and/or assigns of Mr. Lizotte.
Plaintiffs Exhibit ft 13, pp. 1-3.
34. After agreeing to settle the case on the foregoing terms, the chairman and secretary of the PZC affixed the following certificate to the plaintiffs site plans:
 APPROVED BY OPERATION OF LAW It is hereby certified that this Special Permit and Site Plan was approved by operation of law pursuant to Connecticut General Statutes §§ 8-3 (g); 8-3c; 8-7d; 8-26; 8-26d; 8-26e, on November 8, 1987, upon the expiration of the time limits set forth in Connecticut General Statutes § 8-7d and § 8-26d; and recorded on the Land Records in accordance with Connecticut General Statutes § 8-3d and 8-26e. This approval shall expire, and all work must be completed in connection with this approval, on November 8, 1992.
/Edgard Butcher/ Chairman, Enfield Planning Zoning Commission /Edward J. Harris/ Secretary, Enfield Planning Zoning Commission CT Page 11962
Plaintiffs Exhibit ft 1. Upon being so marked, the plans were transmitted by Attorney Mirman to Attorney Shennan, who promptly filed them with the Town Clerk and recorded them, together with the approved special permit, on the Town Land Records on October 7, 1988. Shortly thereafter, prior to October 25, 1988, the plaintiff filed the amended complaint described in the settlement agreement in his zoning appeal. However, the defendants did not file the plaintiffs October 4, 1988 withdrawal of his mandamus action until December 29, 1988.
35. In the mean time, by early November of 1988, the validity of the PZC's closed-door approval of the October 6, 1988 settlement agreement had become the focus of public controversy when the existence and details of the agreement were revealed to the local press. Thus, at the November 3, 1988 meeting of the PZC, after an article concerning the agreement appeared in The Journal Inquirer of Manchester, several local residents appeared to raise questions about Oldefield Farms II which they had never had the opportunity to raise at a properly noticed public hearing. Less than one week later, two separate complaints challenging the legality of the executive session and the actions therein taken were filed with the State Freedom of Information Commission ("FOIC").
36. The first FOI complaint, entitled Rick C. Welker andOldefield Farms Residence Committee v. Enfield Planning andZoning Commission, proceeded under Docket #FIC 88-448. The second such complaint, entitled Ralph Williams and The Journal Inquirerv. Enfield Planning and Zoning Commission, proceeded under Docket #FIC 88-472. The two complaints were consolidated for joint hearing before the FOIC on January 12, 1989, and thereafter heard as contested cases on divers dates through April 13, 1989, with plaintiff Lewis A. Lizotte and the Enfield Town Council, appearing through counsel, participating as intervenors.
37. Throughout the hearings before the FOIC, counsel for the plaintiff, as intervenor, and for the PZC, as respondent, worked closely together to defend the PZC's challenged actions of October 6, 1988.[2] However, on June 28, 1989, the FOIC Hearing Officer before whom the hearings were conducted filed recommended decisions in favor of the petitioners, based on the following proposed findings of fact and conclusions of law:
14. It is found that on October 6, 1988 the respondent held a regularly scheduled meeting. CT Page 11963
 15. It is found that, at that meeting, the respondent convened for ninety minutes in executive session for the stated purpose of discussing personnel items and litigation.
 16. It is found that the purpose of the executive session was to discuss [Lewis A. Lizotte's pending mandamus action and zoning appeal], and to consider the possibilities of settlement.
 17. It is found that while in executive session, the respondent's special counsel[, Attorney Jeffrey Mirman,] advised the respondent that the moratorium extension was very probably ineffective because the amendment to the zoning ordinances had not been filed with the town clerk and that Lizotte's Mandamus Action would very likely be successful, and recommended a settlement agreement regarding the two lawsuits.
 18. It is found that while in executive session, the respondent reached a consensus on taking, and did take, the following actions:
 a. A certification that Lizotte's special use permit and site plan was approved by operation of law was executed but not dated by the chairman and secretary of the respondent and attached to the first page of the site plan (the "Certificate").
 b. The respondent authorized its special counsel to execute a settlement agreement with Lizotte.
 19. It is found that the site plan . . . with the attached undated Certificate, was filed with the Enfield Town Clerk on October 7, 1988.
 *** 32. It is found that the filed agenda for the respondent's October 6, 1988 meeting contains no reference to the Lizotte applications or lawsuits, to Oldefield Farms, or to any matter which could reasonably apprise the complainants or the public of the topic of the executive session convened at that meeting.
CT Page 11964 33. It is also found that there was no motion or vote to add the topic discussed in the executive session to the respondent's agenda.
 34. It is also found that the minutes of the October 6, 1988 meeting reflect only the stated purpose for, occurrence and duration of the executive session; recite those facts, in what are otherwise well-organized and detailed minutes, in the context of an unrelated agenda item; and expressly state that no votes were taken and no decisions were made.
 35. It is also found that the respondent filed no record of any votes taken in executive session at the October 6, 1988 meeting.
 36. It is concluded that where the stated purpose for the October 6, 1988 executive session referred only to pending litigation and personnel items without reference to either the parties to or the subject of the litigation, where no vote was taken to reflect the consensus reached in executive session, and where the minutes of that meeting expressly deny the occurrence of any decisions or votes made in executive session, that the respondent's discussion, decision and action on a nonagenda item in executive session constitutes a secret or unnoticed meeting within the meaning of § 1-21i(b), G.S.
 37. It is found that the filing of Lizotte's site plan with the attached undated Certificate, although giving the complainants constructive notice of the fact of the matters certified in the Certificate, did not give them notice in fact that the Certificate had been executed at the October 6, 1988 secret or unnoticed meeting referenced in paragraph 36, above, nor notice in fact of any other discussion, decision or action taken by the respondent in its secret or unnoticed meeting.
 38. It is found that the complainants received notice in fact of the secret or unnoticed meeting described in paragraph 36, above, on November 2, 1988.
 ***
40. It is concluded that the respondent violated § 1-21
(a), G.S., by considering and acting upon business not CT Page 11965 included in its filed agenda nor added to such agenda.
 41. It is found that the respondent offered no evidence to prove that personnel items were discussed in the executive session.
 42. It is also found that over 100 lawsuits involving the Town of Enfield were pending at the time of the October 6, 1988 meeting.
 43. T is found that the purpose stated by the respondent for its October 6, 1988 executive session failed to reasonably apprise the public that the respondent would discuss, consider or act upon any particular pending lawsuits, and erroneously apprised the public that personnel items would be taken up in executive session.
 44. It is concluded therefore that the respondent violated §§ 1-18a(e) and 1-21 (a), G.S., by failing to state its actual purpose for convening in executive session.
 45. It is found that the respondent failed to keep and maintain a meaningful record of either the subject of or the action taken in its October 6, 1988 secret or unnoticed meeting.
 46. It is concluded that the respondent violated § 1-19
(a), G.S., by failing to keep and maintain a record of the proceedings of the October 6, 1988 secret or unnoticed meeting.
 47. It is found that in determining whether a consensus had been reached on the actions described in paragraph 18 above, the chairman of the respondent asked the individual members of the respondent if they objected to those actions, and that the members of the respondent nodded their assent to those actions.
 48. It is concluded that the consensus reached in executive session constituted a vote.
 49. It is therefore concluded that the respondent violated § 1-21 (a), G.S., by failing to reduce to writing the votes of each of its members on an issue before the agency, and to record such votes in its minutes.
CT Page 11966 50. At the hearing, the respondent maintained that secrecy even as to the fact of its settlement with the intervenor Lizotte was necessary to protect the respondent's litigation posture in similar lawsuits.
 51. It is found that the violations described in paragraphs 40 and 44, above, deprived the complainants and the public of any prior notice of the respondent's discussion, consideration and action upon the matters decided in the October 6, 1988 secret or unnoticed meeting.
 52. It is also found that the violations described in paragraphs 46 and 49, above, deprived the complainants and the public of any subsequent timely notice of the respondent's discussion, consideration and action upon the matters decided in the October 6, 1988 secret or unnoticed meeting.
 53. It is also found that the actions of the respondent in attempting to maintain complete secrecy with respect to its actions in executive session have significantly impaired the complainants' and the public's trust in the respondent and the complainants' and the public's expectation that the respondent is obligated under all circumstances to comply with the requirements of the Freedom of Information Act, particularly when taking actions of significant public importance.
 54. It is found that a restoration of the parties to the status existing before the October 6, 1988 secret or unnoticed meeting will reinstate the complainants' and the public's rights under the Freedom of Information Act which were violated by the respondent.
 ***
Defendant's Exhibit E (Transmittal of Proposed Finding, Freedom of Information Commission, #FIC 88-472, June 28, 1989), pp. 3, 5-8. Based on the above-stated findings and conclusions, which the FOIC adopted at its meeting of July 12, 1989, the Hearing Officer recommended and the FOIC ordered, inter alia, that
 3. All actions of the respondent taken at or as a result of its October 6, 1988 executive session are hereby declared null and void.
CT Page 11967id., p. 8; Plaintiff's Exhibit #19 (Notice of Final Decision, Freedom of Information Commission, #FIC 88-448, July 26, 1989), p 8; Plaintiffs Exhibit #20 (Notice of Final Decision, Freedom of Information Commission, #FIC 88-472, July 26, 1989), p. 8.
38. Following the FOIC's adoption of its Hearing Officer's proposed findings and recommended decisions, the plaintiff for the first time since the completion of Oldefield Farms I attempted to perform wetlands work on his 82-acre parcel. Such work, however, was cut short on or about July 25, 1989, when Enfield Town Planner Michael K. O'Leary determined that the plaintiffs November 2, 1987 wetlands permit had expired, and thus issued a cease and desist order to bring it to a halt. See Defendant's Exhibit #B (Cease and Desist Order of 7/25/89). Neither the plaintiff nor any person representing him appeared to contest the cease and desist order at a July 27, 1989 hearing before the Town Inland Wetlands Watercourses Agency which was scheduled for that purpose.
39. On or shortly after August 2, 1989, without first seeking to reinstate his mandamus action, the plaintiff commenced an initial version of this lawsuit by serving the defendants[3]
with a summons and complaint dated August 2, 1989, which listed a return date of September 5, 1989. Defendant's Exhibit I. In his initial complaint, which was signed by Attorney Sherman, the plaintiff alleged, inter alia, that his underlying mandamus action
 was disputed by the defendants until October 6, 1988 when the parties agreed that the plaintiff would withdraw said actions (sic) forthwith and provide additional undertakings demanded by the defendants as further consideration, and the defendants promised that the said certificate would be delivered to the plaintiff forthwith, all in satisfaction and settlement of the disputed action.
id., ¶ 62, p. 1.
40. On August 9, 1989, the plaintiff filed an application for a building permit to construct a single-family home on his 82-acre parcel. That application, however, was denied because all necessary municipal approvals to build upon the property had not yet been obtained. The plaintiff did not appeal from the denial of his building permit application.
41. On August 14, 1989, the plaintiff amended the complaint CT Page 11968 in his zoning appeal anew, by realleging his ownership of the 82-acre parcel as a partial basis for contesting the challenged zone change. Defendants' Exhibit #C. By so doing, he partially restored his zoning appeal to the status it had before the October 6, 1988 settlement agreement was reached. Still, however, the made no effort to reinstate his mandamus action, and has made no such effort to this day.
42. Instead, on September 7, 1989, the plaintiff commenced the instant action by serving the defendants with a summons and complaint of even date. Summons and Complaint. It was not until then, when he drafted his original complaint in this action, that the plaintiff first alleged that he and the defendants had agreed to settle his underlying lawsuits in September of 1988. Complaint, ¶ 2, p. 1.
 CONCLUSIONS OF LAW I
Each and every count of the plaintiffs Third Revised Complaint is based expressly upon the defendants' alleged breach of a September 1988 agreement to settle the plaintiffs two pending lawsuits against them. According to the plaintiff, the "September 1988 Settlement Agreement" was "finally made" on September 19, 1988; id., Counts I-VI, ¶ 2b; after he accepted the defendants' offer of settlement in early September; id., Counts I-VI, ¶ 2a; memorialized that offer "in the format of a stipulation as of September 16, 1988; id., Counts I-VI, ¶ 2b; and joined "bond phasing detail and costs estimates [to the stipulation] . . . as of September 22, 1988." id.
The plaintiff claims that he "fully performed" his part of the September 1988 Settlement Agreement on or before October 4, 1988 by amending his zoning appeal and withdrawing his mandamus action. id., Counts I-VI, ¶ 3. He also claims that the defendants "fully performed" their part of the Agreement in executive session on October 6, 1988 by issuing a certificate acknowledging the automatic statutory approval of his special permit application and site plans for Oldefield Farms II as of November 8, 1987. Later, however, when the State FOIC invalidated all actions taken during the October 6, 1988 executive session because that session was illegally noticed and conducted, the plaintiff claims that the defendants breached the September 1988 Settlement Agreement by refusing to reissue the certificate of automatic statutory approval at a properly noticed and conducted CT Page 11969 public meeting. id., Counts I-VI, ¶ 7. Claiming he has been injured by the defendants' "neglect and refus[al] to make good their October 6, 1988 performance of the September 1988 Settlement Agreement;" id.; the plaintiff seeks injunctive relief to compel the reissuance of the certificate and compensatory damages for his injuries on theories of misrepresentation, breach of contract, administrative res judicata, violation of civil rights and estoppel.
The Court concludes initially that each of the plaintiffs claims must be rejected because he has failed to prove the existence, much less the breach, of any September 1988 Settlement Agreement between himself and the defendants. The reasons for this conclusion are fully set forth in paragraphs 20-30 of the Findings of Fact, supra at pp. 9-13. To recap them briefly, they are as follows:
Though Attorney Mirman had discussed the possibility of settling the plaintiffs lawsuits with Attorney Sherman ever since he took over the defense of those cases, he was not authorized to negotiate the terms of a possible settlement until September 15, 1988, nor empowered to make a particular settlement offer at any time prior to the defendants' ill-fated executive session of October 6, 1988. Consistent with those limitations, Attorney Mirman broached his clients' interest in pursuing a settlement with Attorney Sherman as soon as he was authorized to do so, but never made an offer which the plaintiff could have accepted and reduced to writing as of September 16, 1988.
In fact, the September 16, 1988 Stipulation prepared by Attorney Sherman was a proposal for settling the plaintiff's underlying cases along lines previous discussed with Attorney Mirman, not the embodiment of a final settlement offer which the defendants had made and the plaintiff had accepted. As noted in detail in the Findings of Fact, supra at 9-11, the Stipulation was unsigned and undated; id., ¶ 20, pp. 9-10; it omitted material terms; id., ¶ 21, p. 10; and it was repeatedly referred to in correspondence between counsel as a "draft." Id., ¶ 22, pp. 10-11.
More significantly, perhaps, the course of dealings between Attorney Mirman and Attorney Sherman clearly showed that their negotiations were ongoing on and after September 29, 1988, the day on which the plaintiff claims that the parties' "Settlement Agreement was finally made." Third Revised Complaint, Counts I-VI, ¶ 2a. Thus, as explained in paragraphs 23-30 of the CT Page 11970 Findings of Fact, supra at 11-13, Attorney Mirman prepared a new "draft Settlement Agreement" which he faxed to Attorney Sherman "for discussion purposes only" on September 29, 199; id., ¶ 24, p. 11; the new draft Settlement Agreement differed materially from Attorney Sherman's September 16, 1988 Stipulation in several respects id., ¶¶ 26-29, pp. 11-13; but Attorney Sherman failed to object to such "changes" in spite of what he now claims to have been the parties' prior settlement agreement. In fact, he agreed to such "changes" without protest, suggesting that there never was an earlier offer and acceptance of a settlement agreement, but only discussions progressing towards the defendants' acceptance of counsels' joint settlement proposal at their illegal executive session of October 6, 1988. Against this background, it is hardly surprising that until the plaintiff filed the instant action, he asserted through counsel that his settlement agreement with the defendants was not reached until October 6, 1958.[4] In fact, the only agreement the plaintiff and the defendants ever entered into was that which was approved by the defendants at their executive session of October 6, 1988 and accepted by the plaintiff when his counsel filed his certified site plans in the Town Clerk's office and recorded them on the Land Records. That was the first time the defendants authorized a settlement on any terms, and the only time there was a meeting of the minds as to all the terms upon which a settlement might be reached.
For all of these reasons, the Court concludes that the plaintiff and the defendants never entered into a September 1988 Settlement Agreement to resolve the plaintiffs underlying lawsuits. Because the alleged breach of such an agreement underlies each count of the plaintiffs Third Revised Complaint, the defendants are entitled to judgment on each such count as a matter of law.
 II
In light of the findings made and conclusions reached in Part I of this Memorandum of Decision, the plaintiff's claim of breach of contract must obviously be rejected. The only settlement agreement the plaintiff claims that he and the defendants ever entered into is one whose existence he has not proved. On the evidence here presented, there simply never was a September 1988 Settlement Agreement.
Furthermore, the only settlement agreement the parties ever did enter into — that which the defendants approved in CT Page 11971 their illegal executive session of October 6, 1988 — is unenforceable by the plaintiff for two reasons. First, of course, the FOIC has declared that agreement null and void for all of the reasons stated in its Final Decisions of July 12, 1989. The defendants' executive session on that date was found to have been unlawful because, inter alia, it was an "unnoticed or secret meeting," within the meaning of General Statutes § 1-21 i(b) (now General Statutes § 1-206), which the complainants and other members of the public were denied the right to attend. The defendants' approval of the agreement at that meeting was thus subject to invalidation under General Statutes § 1-21 i(b)(2) (now General Statutes § 1-206 (b)(2)), which then empowered the FOIC, upon rendering its final decision on an FOI appeal, to "declare null and void any and all actions action taken at any meeting which [the complainant] was denied the right to attend[.]"
Second, even if the plaintiff could somehow base a breach-of-contract claim upon the unlawful October 6, 1988 settlement agreement, he has not attempted to do so. Obviously aware of the agreement's invalidity in light of the FOIC's Final Decisions, he has consistently pleaded and sought to prove that the defendants' actions in the illegal executive session were merely the improper performance of a prior valid agreement, which could still be enforced and easily be remedied by a new performance at a lawful public meeting, rather than the improper approval or formation of a new and invalid agreement, which could never be enforced. It is a matter of axiom that a party cannot rely upon a factual or legal theory he has not pleaded or sought to prove. Hence, though the Court has broad discretion to permit amendments to pleadings "[i]n all cases of material variance between allegation and proof," Practice Book § 10-62
(formerly § 178), it cannot amend a party's pleadings sua sponte, or enter judgment for the party based on facts not provable under those pleadings. Here, where the plaintiff has not only not claimed a breach of the October 6, 1988 settlement agreement, but consistently denied its very existence, the Court could not impose liability for such a breach even if the agreement were otherwise valid and enforceable.
 III
Notwithstanding his failure to prove the breach of a valid contract, the plaintiff claims, in the alternative, that all obligations allegedly arising under his unproved September 1988 Settlement Agreement are enforceable against the defendants on CT Page 11972 grounds of ratification and estoppel. In Connecticut, he rightly argues, a municipality may sometimes be found to have ratified an invalid contract, and thus to have estopped itself from refusing to comply with the terms of that contract. The general rule on this subject, claims the plaintiff, is that stated by our Supreme Court in Pepe v. New Britain, 203 Conn. 281, 293-94, 524 A.2d 629
(1987). There, where a municipality refused to pay its lawyers for their services, claiming that the contract for those services was illegally entered into, the Supreme Court held as follows for the plaintiffs on grounds of ratification and estoppel:
 "Where the contract is one which the municipality had the power to make, [however,] it is possible for a court to hold that the municipality has, by taking the benefit of the contract, ratified it, or estopped itself from claiming it was not executed according to law." [footnote omitted] Bridgeport Brass Co. v. Drew, 102 Conn. 206, 215, 128 A. 413 (1925); see Vito v. Simsbury, 87 Conn. 261, 265, 87 A. 722
(1913); Rocky Hill v. Hollister, 59 Conn. 434, 447, 22 A. 290 (1890); see also John J. Brennan Construction Corporation, Inc. v. Shelton, 187 Conn. 695, 712, 448 A.2d 180 (1982); State ex rel. Gaski v. Basile, 174 Conn. 36, 40, 381 A.2d 547 (1977). "A contract, invalid because made at a special meeting of which certain members had no notice, but which is legitimate and proper and within the scope of the council's power, will be enforced against the city where it has received the benefit of the contract. . . ." 1 J. Smith, Commentaries on the Modern Law of Municipal Corporations (1903) 745, p. 746; see also Hitchcock v. Galveston, 96 U.S. 341, 351, 24 L.Ed. 659
(1877).
Pepe v. New Britain, supra, 203 Conn. at 294.
"A municipality," the plaintiff argues, "may ratify a contract by express acts or by conduct." Plaintiff's Post Trial Brief, p. 6 (quoting McQuillin, Municipal Corporations (3d Ed. Rev. 1990), § 29.103. However it concedes, again citing McQuillin, that "[w]hen the ratification is of the latter kind, the element of estoppel is generally involved either as a minor or major element." Id. Our cases thus establish that a municipality may be held to have ratified an unauthorized contract by retaining the benefit of that contract, provided it does so "under circumstances which estop it from denying its liability." Loomis v. Fifth School District, 109 Conn. 700, 704,145 A. 571 (1929). CT Page 11973
Applying these authorities to the facts here presented, the plaintiff argues that the defendants ratified the alleged agreement in three ways: First, they initially performed the agreement themselves — specifically, by issuing the requested certificate of automatic statutory approval on October 6, 1988. Second, they accepted the benefits his own performance of the agreement — most importantly by filing his October 4, 1988 withdrawal of his mandamus action on or about December 12, 1988. Third, they confirmed the existence of the parties' agreement throughout the hearings before the FOIC. Claiming that his own performance of the agreement was induced by the defendants' above-described conduct, and that the defendants' later refusal to make good on their initial performance has caused him to suffer great injury, the plaintiff claims that the defendants must be estopped from refusing to honor the agreement by reissuing the certificate of automatic statutory approval.
The defendants acknowledge that "in certain limited circumstances, estoppel may be invoked against a municipality."Kimberly-Clark Corp. v. Dubno, 204 Conn. 137, 146, 527 A.2d 679. However, they advance several persuasive reasons why this is not a proper case for such an invocation.
First, the defendants claim that the only proven agreement between themselves and the plaintiff — the unplcaded agreement of October 6, 1988 — is not subject to ratification or enforcement by estoppel because it was entered ultra vires. Without conceding that the subject agreement could ever be relied on for any purpose, they urge this Court to find that that agreement could never be ratified under the following rule, never mentioned by the plaintiff, which also appears in McQuillin's treatise:
 Contracts which a municipal corporation is not permitted legally to enter into are not subject to ratification, and a city may not be estopped to deny the invalidity of a contract that is ultra vires in the sense that it is not within the power of the municipality to make. In other words, no ratification or estoppel can make lawful a municipal contract which is beyond the scope of the corporate powers, or which is not executed in compliance with mandatory conditions prescribed in the charter or statutes or which is contrary to a declared policy adopted to protect the public. Id., § 29.104.30.
CT Page 11974 Under this rule, which our Supreme Court relied on to reject a claim of municipal estoppel in Fennell v. Hartford,238 Conn. 809, 818, 681 A.2d 934 (1996), the defendants argue that their only proven agreement with the plaintiff was obviously enteredultra vires, for even if the defendants had the general corporate power to settle lawsuits against them, they clearly lacked the power to do so without complying with the mandatory requirements of the State Freedom of Information Act ("FOIA"). Since its adoption, the FOIA has prescribed mandatory conditions for the conduct of meetings before municipal boards and agencies. It requires that most such meetings be conducted in open public session, where the public can learn first-hand how its business is being conducted.
In so doing, moreover, the FOIA declared and implements an important public policy, "one that favors the open conduct of government and free public access to governmental records, . . . and thus express[es] the people's sovereignty over the agencies which serve them[.] Glastonbury Education Assn. v. Freedom ofInformation Commission, 234 Conn. 704, 711-12, 663 A.2d 349
(1995). The importance of this public policy cannot be overestimated. By giving the FOIC the power to overturn actions of governmental bodies taken in violation of the FOIA, the General Assembly clearly sought to "require diligent protection of the public's right of access to agency proceedings." Id. at 712.
Against this background, the Court agrees with the defendants that the only agreement it ever made with the plaintiff to settle his underlying lawsuits — that which was approved in the illegal executive session of October 6, 1988 — was an ultravires action that cannot be ratified or enforced by estoppel. Under the rule of Fennell v. Hartford, supra, 238 Conn. at 818
(adopting the rule stated in § 29.104.30 of McQuillin's treatise), the agreement is clearly not subject to ratification because it was approved in direct violation of state statutes declaring an important policy adopted to protect the public.
The defendants further argue that even if their illegal, October 6, 1988 settlement agreement with the plaintiff was not entered ultra vires, and thus could conceivably be ratified and enforced by estoppel, none of their alleged acts of ratification were performed under the circumstances justifying the invocation of estoppel. For the following reasons, the Court agrees.
Our Supreme Court has described as follows Connecticut's CT Page 11975 doctrine of municipal estoppel:
 Under our well established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. Bozzi v. Bozzi, 177 Conn. 232, 242, 413 A.2d 834 (1979); Dupuis v. Submarine Base Credit Union, Inc., 170 Conn. 344, 353, 365 A.2d 1093
(1976); Pet Car Products, Inc. v. Barnett, 150 Conn. 42, 53-54, 184 A.2d 797 (1962). Although estoppel may not generally be invoked against a public agency in the exercise of its governmental functions; Dupuis v. Submarine Base Credit Union. Inc., supra, 353; Bianco v. Darien, 157 Conn. 548, 556, 254 A.2d 898 (1969); State v. Stonybrook, Inc., 149 Conn. 492, 501, 181 A.2d 601, cert. denied, 371 U.S. 185, 83 S.Ct. 265, 9 L.Ed.2d 227 (1962); 6 McQuillin, Municipal Corporations (3d Ed. Rev.) 20.13; 8A McQuillin, supra, 25.349, 25.358; an exception is made where the party claiming estoppel would be subjected to a substantial loss if the municipality were permitted to negate the acts of its agents. Dupuis v. Submarine Base Credit Union, Inc., supra, 354; see 6 McQuillin, supra; 9 age McQuillin, supra, 27.56. Estoppel against municipalities is therefore limited and may be invoked against the enforcement of zoning regulations (1) only with great caution, (2) only when the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the regulations. Dupuis v. Submarine Base Credit Union, Inc., supra, 354. . . . [I]t is the, burden [of the party claiming estoppel] to show that in [relying upon the municipality's words or conduct as to the legality of his actions, he] exercised due diligence in ascertaining its legality. Dupuis v. Submarine Base Credit Union, Inc., supra, 353; see Linahan v. Linahan, 131 Conn. 307, 327, 39 A.2d 895 (1944).
Zoning Commission v. Lescynski, 188 Conn. 724, 731-32,453 A.2d 1144 (1982). Under these rules, the actions by which these defendants are claimed to have ratified the illegal October 6, 1988 agreement are insufficient to justify the invocation of estoppel for the following reasons. First, the defendants did nothing "calculated or intended to induce [the plaintiff] to CT Page 11976 believe [that the agreement was lawful] or to act on that belief." Second, even if any part of the defendants' conduct had the potential to persuade the plaintiff of the legality of the October 6, 1988 executive session and agreement, the plaintiff, who at all times was represented by counsel, never relied on such conduct to his detriment.
The lawfulness of the October 6, 1988 executive session, or thus of the parties' agreement approved in that session, were not called into question, much less debated by the parties, before the two FOI appeals were filed. Thus nothing the defendants did before the filing of those appeals can be thought to have influenced the plaintiff's views on those unraised subjects, much less to have affected the plaintiffs own actions in any way. Surely, the defendants, like the plaintiff himself, treated the agreement as if it were valid. However, his actions in fulfillment of the agreement were animated by his own lawyer's analysis, not by the actions of the defendants. Indeed, as the plaintiff has pointedly argued, all of the documents necessary to effect his performance of the agreement were tendered to defendants' counsel before the meeting of October 6, 1988, not afterwards.
After public controversy arose as to the legality of the executive session and the parties' closed-door settlement agreement, it is true that the defendants defended the legality of the session and the agreement before the FOIC. The mounting of that defense, however, surely did not mislead the plaintiff as to the legality of those actions, or cause him to change his own position on that issue. There again, the plaintiff was represented by competent counsel. Counsel was in a fine position to evaluate the legality of the defendants' challenged conduct based upon his own plenary access to the relevant facts and his own powers of legal analysis. The plaintiffs actions while the FOI appeals were pending were thus clearly attributable to his lawyer's legal advice, not to parallel arguments made or positions taken by the defendants.
At any time during the pendency of the FOI appeals, moreover, the plaintiff could have amended his zoning appeal to reassert the claims he had previously withdrawn in fulfillment of the settlement agreement. In the absence of an enforceable agreement, nothing could have stopped him from so doing, as was later made apparent by his taking that very action on August 14, 1989. In reliance on his counsel's advice and strategy, however, he took no such step until he resolved to sue the defendants. CT Page 11977
More importantly, perhaps, he could have sought to open his withdrawal of the mandamus action, or otherwise to reinstitute that action, if he harbored any doubt as to whether the challenged agreement was legally valid. He had the right to open his withdrawal as long as the case remained on the court's docket, that is, until the end of the term of court. Lusas v. St.Patrick's Roman Catholic Church Corp. , 123 Conn. 166 (1937). The appropriate remedy thereafter would have been a petition for a new trial, which he could have filed at any time within three years from the date of the withdrawal. In any event, he had the opportunity to pursue one or the other of those courses of action both during the FOI hearings and thereafter, when instead he filed this suit. Therefore, even if the defendants' belated filing, through counsel, of the plaintiffs withdrawal of his mandamus action betokened their desire to accept the benefits of the parties' October 6, 1988 agreement, their taking of that action did not induce him to change his position on any matter or thereby cause him to suffer any harm. Having the power to undo the withdrawal of that action at any time, he cannot attribute the alleged "loss" of his right to pursue that action to anything but his own tactical decisions, as informed and guided by his own lawyer's analysis and advice.
In sum, this is clearly not a situation where special circumstances make it highly inequitable or oppressive not to invoke estoppel against a municipality. To the contrary, this is a case in which the invocation of that doctrine would be totally inappropriate.
 IV
The plaintiffs final three claims — described as misrepresentation, administrative resjudicata and deprivation of civil rights — have not been made the subject of any proposed findings of fact or conclusions of law. In fact the only arguments made concerning each of them are made in the plaintiffs Brief In Opposition To Section 302 Motion To Dismiss, which was appended to the plaintiffs opening post trial brief. For the following additional reasons, as well as those stated in Part I of this Memorandum of Decision, the Court rejects each such claim.
To prove a cause of action for fraudulent misrepresentation, a plaintiff must establish the following essential elements:
CT Page 11978 (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury.
Miller v. Appleby, 183 Conn. 51, 54-55, 438 A.2d 811 (1981). In the First Count of the plaintiffs Third Revised Complaint, after pleading the formation of the so-called September 1988 Settlement Agreement, the plaintiff baldly claims that the defendants "have injured the plaintiff by acts and omissions constituting misrepresentations" without specifying what those misrepresentations were, without claiming that they were untrue and known to be untrue, without claiming that they were made to induce the plaintiffs reliance on them, and without claiming that he was injured by acting in such reliance. The relevant count of the plaintiffs pleading is thus legally sufficient to sustain a cause of action, wherefore judgment thereon must enter for the defendants. See, e.g., Stavnezer v. Sage-Allen Co.,146 Conn. 460, 462, 152 A.2d 312 (1959) (holding that the trial court erred by failing to grant the defendant's motion, made at the close of all the evidence, to direct a verdict "on the ground . . . that the only cause of action set forth in the complaint was [a] . . . defective one sounding in slander"); Magnan v. AnacondaIndustries, Inc., 193 Conn. 558, 573, 479 A.2d 781 (1984) (holding, inter alia, that where the facts alleged in the first count of the plaintiffs complaint were inadequate to establish a legally cognizable breach of the implied covenant of good faith and fair dealing, a verdict should have been directed on that count); Red Maple Properties v. Zoning Commission, supra.222 Conn. at 735 (upholding the trial court's direction of a verdict on the ground that the plaintiff's claim did not constitute a substantive due process violation as a matter of law).
As explained in the plaintiffs memorandum, moreover, the claim the plaintiff hoped to present under this count was based on the following claimed misrepresentations that have not been proved. The first is that, although the defendants promised to perform the alleged September 1988 Settlement Agreement in a lawful manner, they intended to perform it in an unlawful manner and did perform it in that manner. This claim, of course, has not been proved for the reasons stated in Part I of this Memorandum of Decision, because the unlawful actions taken at the meeting of October 6, 1988 did not constitute the performance of an earlier agreement, but the formation of a new agreement. There was simply no representation the plaintiff could rely on until the meeting CT Page 11979 of October 6. The second claimed intentional misrepresentation was that the defendants would perform the settlement agreement by issuing a valid certificate of automatic statutory approval when they intended all along to cancel that approval. The Court has not found, and on this record cannot find, that the defendants entered any settlement agreement with the plaintiff in September 1988, or that they entered the settlement agreement of October 6, 1988 with the intent to undermine it in the manner the plaintiff suggests.
In conclusion, the plaintiff has failed to prove her claim of misrepresentation, as set forth in Count One of her Third Revised Complaint, since it is based on an alleged settlement agreement whose existence was not proved, it is not sufficiently pleaded to state a valid cause of action, and as explained by the plaintiff in her arguments, it is not established by the credible evidence in this case.
The plaintiffs claim of administrative res judicata suffers from the same deficiencies as its claim of misrepresentation. Utterly unparticularized, as it has been pleaded in the Third Count of his Third Revised Complaint, it is alleged as a simple legal conclusion, unmoored to specific facts other than the alleged formation of the September 1988 Settlement Agreement, that defendants "have injured the plaintiffs by acts and omissions constituting violation of administrative res judicata." As such, the Third Count fails to set forth a legally cognizable cause of action, and wherefore judgment thereon must enter for the defendants.
As explained by the plaintiff in his brief, moreover, the claim sought to be presented in that unilluminating count is that the defendants, having once agreed to perform its agreement with the plaintiff, are still bound to do so because the circumstances between them have not changed. There are two answers to this argument, both previously discussed in considerable detail. First, there never was a September 1988 Settlement Agreement that the parties bound themselves to perform, each on behalf of the other. See Part I, supra. Second, the only agreement actually entered into by the parties was null and void, and thus is unenforceable. In short, there is no valid and subsisting contract upon which the plaintiff can rely, much less a valid and subsisting judgment he can enforce under the doctrine of res judicata.
As for the plaintiffs argument that the defendants, by their CT Page 11980 conduct, have deprived him of his property without due process of law, this argument fails for three reasons as well. First, it is based expressly upon the existence of the alleged September 1988 Settlement Agreement, which has not been proved. Second, it too has been inadequately pleaded as a simple legal conclusion. Third, as explained in the plaintiffs brief, the only basis for asserting such a claim is the alleged breach of a property interest in the September 1988 Settlement Agreement. Even if a simple breach of contract by a municipal agency could be found to constitute such a constitutional violation, the plaintiffs failure to prove the existence of a valid and enforceable contract would defeat such a claim in this case.
 CONCLUSION
For all of the foregoing reasons, judgment hereby enters for the defendants on all counts of the plaintiffs Third Revised Complaint this 31st day of August, 1999.
Michael R. Sheldon, J.